**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**


SUSAN LARSEN                                                                    PLAINTIFF

v.                                        **CASE NO. 5:18-CV-5093**

MAYNARD, INC.                                                                 DEFENDANT

<u>**MEMORANDUM OPINION AND ORDER**</u>

Currently before the Court are a Motion for Summary Judgment (Doc. 31), Brief in Support (Doc. 29), and Statement of Facts (Doc. 30) filed by Defendant Maynard, Inc. Plaintiff Susan Larsen has submitted a Response in Opposition (Doc. 33) and Response to Statement of Facts (Doc. 32). The Court has also received a Reply (Doc. 35) by Maynard. The motion for summary judgment is now ripe for decision and, for the reasons stated herein, is **GRANTED IN PART AND DENIED IN PART**.

## I. BACKGROUND

### A. Factual Background

The facts of this case are straightforward and largely undisputed. However, because the instant motion is one for summary judgment, the Court will recite the facts in the light most favorable to Larsen, the non-moving party, and will limit its discussion only to what is necessary to provide context for the Court's ruling. Because the chronology of events is important to the various claims in this case, the Court recites the following facts chronologically.[1]

---

[1] Additional facts relevant only to certain causes of action are discussed in the sections addressing those claims.

Maynard hired Larsen in March of 2014 as a welder. Her job description included welding and straightening parts. (Doc. 31-1, p. 7). From March 2014 until 2016, Larsen received numerous raises despite having at least two prior disciplinary events at Maynard.[2]

The events central to the present dispute, however, began in March of 2016 when Larsen and her husband drove their motorcycles from Prairie Grove, Arkansas to Daytona, Florida and back to attend Daytona Bike Week. The following month, Larsen began a nine-week work absence at Maynard after filing a worker's compensation claim complaining of shoulder pain. Shelley Lisenbee, who was Maynard's Business Operations Manager during Larsen's employment, testified that she gave Larsen Family and Medical Leave Act ("FMLA") paperwork to complete in connection with her worker's compensation claim. However, no FMLA paperwork relating to this event appears in the record.

On or about June 22, 2016, Larsen returned from her medical absence with no medical or physical restrictions. However, she alleges that she remained in considerable pain at this point and could not even lift fifteen pounds at a time. At some point, Larsen informed an individual at Maynard that she was unable to lift heavy metal bars because of her shoulder pain, and Maynard provided her initially with a makeshift table made out of shipping pallets, and later with an actual table.

---

[2] In October of 2014, Larsen was suspended for three days without pay for excessive absenteeism and tardiness. On December 16, 2015, Larsen received discipline for rude comments and behavior toward another employee. That employee was also disciplined in connection with that event.

Five days after she returned from her medical absence, Maynard provided Larsen with FMLA paperwork, as Larsen had discussed her condition with Evelyn Flynn, Maynard's Primary Resources Communications (human resources) administrator, and later mentioned that she desired to visit the Mayo Clinic. Larsen was instructed to return the medical provider's certification by July 11, 2016 so that Maynard could determine whether her leave to attend the Mayo Clinic qualified under the FMLA. Because Larsen did not have an appointment at the Mayo Clinic, she failed to submit any certification for family medical leave by July 11, 2016.

Either on August 4 or August 5, 2016, Larsen approached her supervisor, Shad Gilman, inquiring about whether she could start a welding job that had become available. Gilman told her that this job was not a top priority and that he needed her to continue working in deburring.[3] She complained to him about that and said that it was "bullshit" that she had to continue deburring. On August 5, 2016, Larsen requested to take time off for August 16 and 17, in order to go to the Mayo Clinic for an examination of her shoulder. Gilman approved the request on the same day. On August 15, 2016, Randall Lewis, a fellow welder at Maynard, filed a written complaint against Larsen. He complained that Larsen came up to him the first day that he returned following his wife's death and said to him that she (Larsen) had been told by Lewis' wife at Lewis' wife's funeral to tell Lewis to "keep [his] shirts [i]roned and to go to church." (Doc. 35-14, p. 1). Lewis said that he did not know how to react but that he became more upset the more he thought about it.

---

[3] According to the evidence in the record, "deburring" is the process by which different tools are used to clean up, condition, or smooth a rough edge from a welded metal part. The welders deposed in this case all uniformly said that they had been required to deburr at some point in their careers, and many commented that they preferred welding to deburring because deburring is a louder, dirtier job. *See, e.g.*, Doc. 32-3, p. 2.

He ultimately reported the event to his supervisor and filed a written complaint against Larsen on August 18, 2016. Maynard investigated the complaint.

On August 16 and 17, 2016, Larsen attended the Mayo Clinic in Rochester, Minnesota to have her shoulder evaluated. Before she left, Larsen was informed by Maynard that her leave would be retroactively approved as family medical leave if she returned the proper medical certification when she returned from the Mayo Clinic. She ended up seeing two different doctors during her visit to the Mayo Clinic. The first told her only that she would not need surgery, but the second diagnosed her with a degenerative shoulder condition and recommended that she receive guided shots to help manage her pain. She ultimately received those shots when she returned to Arkansas. During her time at the Mayo Clinic, she realized that in order to get a second opinion from this second physician, she would have to stay an extra day, so she called Maynard to request time off for August 18 as well. Maynard approved that request. That same day, the decision was made to terminate Larsen.

On August 19, Larsen returned to Maynard, where she was informed of her termination. The Termination of Employment sheet reflects that Larsen was terminated for misconduct and "other" conduct. (Doc. 31-1, p. 19). The additional remarks section of that form reports that she was terminated for "[e]xhibiting negative behavior to include disrespect to managers and coworkers, creating dissension among others, and creating a hostile work environment toward her co-workers." *Id.* It does not appear from the record that Larsen brought her FMLA certification with her on August 19 when she returned to work.

**B. Procedural Background**

Ms. Larsen then filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). On February 7, 2018, Larsen received a right-to-sue letter from the EEOC. She then timely filed suit within 90 days of her receipt of the letter.

Her Complaint (Doc. 3) alleges that she was discharged because of her gender and discriminated and retaliated against because she took time off of work to obtain diagnosis and treatment for her shoulder injury. As such, the Complaint alleges claims under Title VII, the Americans with Disabilities Act ("ADA"), the FMLA, and related state law claims under the Arkansas Civil Rights Act ("ACRA").

**II. LEGAL STANDARD FOR SUMMARY JUDGMENT[4]**

The standard for summary judgment is well established. Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l. Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).

---

[4] Larsen has alleged several causes of action. To improve readability, the elements required to establish the *prima facie* case for each of these causes of action and the burden-shifting framework used to analyze some of the causes of action will not be recited here in one large legal standard section. Rather, the Court will discuss these below when analyzing whether the claims survive summary judgment.

Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). However, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive summary judgment. *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Rather, in order for there to be a genuine issue of material fact that would preclude summary judgment, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). To meet its burden, "[t]he nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

### III. DISCUSSION

Larsen has asserted nine different causes of action against Maynard. These range from Title VII claims to violations of the ADA and ACRA. Because of the sheer number of claims against Maynard and for organizational clarity, the Court will divide this section into two sub-sections: one focusing on the claims that are subject to the familiar *McDonnell Douglas* burden-shifting framework and one focusing on the remaining, analytically distinct claims that are analyzed according to different standards.

### A.  The *McDonnell Douglas* Claims

While the elements required to establish *prima facie* cases for each of the causes of action Larsen asserts are different (and therefore discussed below when evaluating each cause of action), certain of her causes of action are analyzed using a now familiar burden-shifting framework. Indeed, Larsen's ADA disparate treatment (discrimination) and retaliation, gender discrimination and retaliation, and FMLA discrimination and retaliation claims are analyzed through nearly identical processes.[5]

A plaintiff may establish a discrimination or retaliation claim through either direct or indirect evidence. *See King v. United States*, 553 F.3d 1156, 1160 (8th Cir. 2009). In the absence of direct evidence, "the court analyzes [a plaintiff's] claim under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Tusing* 639 F.3d at 515 (citing *King v. United States*, 553 F.3d at 1160). Under that framework, a plaintiff bears the initial burden of establishing a *prima facie* case. *Id.* (citing *King*, 553 F.3d at 1162). Once the plaintiff does so, "the burden of production then shifts to the employer to articulate a legitimate non-discriminatory reason for its employment action." *Id.* (citing *King*, 553 F.3d at 1160). If the defendant can meet that burden of

---

[5] *See, e.g.*, *Olsen v. Capital Region Med. Ctr.*, 713 F.3d 1149, 1153 (8th Cir. 2013) (applying the *McDonnell Douglas* framework to ADA discrimination claims); *E.E.O.C. v. Prod. Fabricators*, 763 F.3d 963, 972 (8th Cir. 2014) (applying *McDonnell Douglas* to ADA retaliation claims); *Robinson v. Am. Red Cross*, 753 F.3d 749, 754 (8th Cir. 2014) (applying *McDonnell Douglas* to Title VII retaliation claims); *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 878 (8th Cir. 2014) (applying *McDonnell Douglas* to gender discrimination claims); *Sisk v. Picture People, Inc.*, 669 F.3d 896, 899 (8th Cir. 2012) (applying *McDonnell Douglas* to FMLA retaliation claims); *Pulczinski v. Trinity Structural Towers*, 691 F.3d 996, 1007 (8th Cir. 2012) (applying *McDonnell Douglas* to FMLA discrimination claim).

production, then the burden shifts back to the plaintiff "to demonstrate by a preponderance of the evidence that the stated non-discriminatory rationale was a mere pretext for discrimination." *Id.* (quotation and citation omitted).

Therefore, for Larsen's various discrimination and retaliation claims, the Court will first evaluate whether she has presented direct evidence showing discrimination. If so, then the claim is entitled to go to the jury. If not, the Court will follow the burden-shifting framework outlined above to determine whether summary judgment is proper.

### 1. ADA Discrimination (Disparate Treatment) Claim

The ADA makes it unlawful for a covered employer to discriminate against any "qualified individual on the basis of disability." 42 U.S.C. § 12112(a); *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013). Discrimination under the ADA includes, in relevant part, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5). And, the ADA prevents employers from retaliating against persons who invoke the Act's protections. 42 U.S.C. § 12203(a). A plaintiff thus can bring claims under the ADA for failure to accommodate, retaliation, and other forms of disparate treatment. It is clear from the record that Larsen asserts three distinct ADA claims: a disparate treatment claim (alleging that she suffered an adverse employment action because of her disability), a retaliation claim, and a reasonable accommodation (failure to accommodate) claim. The Court considers the first two claims in this section, and it will consider the analytically distinct accommodation claim in a later section because it does not apply the traditional *McDonnell Douglas* burden-shifting framework.

Before evaluating the evidence in the record, the Court must first determine that

Larsen was entitled to ADA protection. As the Eighth Circuit held in *Peyton v. Fred's Stores of Arkansas, Inc.*, because of the statutory language, "ADA protection extends *only* to a qualified individual with a disability." 561 F.3d 900, 902 (8th Cir. 2009) (emphasis added). A plaintiff's impairment qualifies as a disability only if it creates a "substantial limitation" on "one or more major life activities." 42 U.S.C. § 12102(1)(A). The definition in the ADA "encompasses not only individuals with actual 'physical or mental impairment[s],' but also those with 'a record of such an impairment,' or those 'regarded as having such an impairment.'" "The definition of disability in [the ADA] shall be construed in favor of broad coverage of individuals under [the] Act." *Orr v. City of Rogers*, 232 F. Supp. 3d 1052, 1064 (W.D. Ark. 2017); 42 U.S.C. § 12102(4)(A).

Maynard first argues that Larsen's ADA claims must all be dismissed because Larsen is not disabled within the meaning of the ADA. The core of Maynard's argument on this point is that Larsen's shoulder injury was a temporary condition that did not create a substantial limitation on one or more major life activities. Maynard additionally argues that it is quite odd that Larsen still claims to be disabled and in need of certain accommodations because of her shoulder when she subsequently (after being terminated by Maynard) applied to other welding jobs and provided no indication when asked in her application that she had previously been out on worker's compensation or that she had any difficulty lifting heavy objects. *See, e.g.*, Doc. 35-2, p. 1 (job application to FenceCo, Inc. where Larsen indicated that she had never filed a Work Comp claim and answered "no" when asked whether she had any conditions that would prevent her from lifting heavy objects of between 80-100 pounds).

While the Court finds these facts troubling to Larsen's chances of succeeding on

her ADA claims, it ultimately finds that there is sufficient evidence to establish that she is (and was regarded as) having an impairment that substantially limits one of life's major activities. Here, her degenerative shoulder condition, which has been documented in the record, is alleged to impede Larsen's ability to lift objects, one of the major life activities specifically enumerated in the ADA. *See* 42 U.S.C. § 12102(2)(A).  In short, the arguments advanced by Maynard more properly create a question of fact (and credibility) about whether Larsen had an impairment that substantially limited one of life's major activities. But, at summary judgment, such "ties" go to the non-movant. Thus, the Court will proceed to the rest of the analytical process by first evaluating whether there is direct evidence of discrimination. If so, then the claim is entitled to go to trial. If not, the Court will proceed according to the *McDonnell Douglas* framework.

As the Eighth Circuit noted in *Shaffer v. Potter*, direct evidence includes "evidence of conduct or statements by persons involved in the [decision-making] process that may be viewed as directly reflecting the alleged discriminatory attitude, where it is sufficient to support an inference that discriminatory attitude more likely than not was a motivating factor." 499 F.3d 900, 904 (8th Cir. 2007) (quotation omitted). In simpler terms, direct evidence "most often encompasses remarks by decisionmakers that reflect, without inference, a discriminatory bias." *McCulloch v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861 (8th Cir. 2009).

The Court finds sufficient direct evidence of discrimination to warrant this claim going to trial. Gilman, Larsen's supervisor, testified during his deposition that one of the reasons that he recommended Larsen's termination was due to her repeated absences from the job, which slowed down production. Indeed, at his deposition, he was asked:

Q: Had Susan been missing a lot of work before her termination?
A: Yeah.
Q: Okay. Was that a problem for your production?
A: Yes.
Q: Okay. Tell me how that was a problem.
A: We were unable to get product out.
Q: Was that part of the reason that you were recommending termination?
A: I—yeah.

Deposition of Shad Gilman, Doc. 32-7, p. 8. It is undisputed that the only time that Larsen had missed during the immediately preceding period before her termination was due to her medical absence in April because of her shoulder condition and her later visit to the Mayo Clinic that occurred over the three days immediately preceding her termination. It is also undisputed that Gilman was one of the decision-makers involved in the process of Larsen's termination. As such, the Court finds that this testimony is sufficient to constitute direct evidence. It is one thing to remark during a deposition that an employee's absence due to medical leave has made it hard on remaining team members. It is quite another to testify that this factored into your decision to recommend termination. It is this latter piece, connecting the statements made by Gilman with the resulting adverse employment action, that qualifies the statement as direct evidence. Therefore, Maynard's motion for summary judgment is **DENIED** as to Larsen's ADA discrimination claim.

### 2. ADA Retaliation, FMLA Discrimination, and FMLA Retaliation Claims

An oddity of the ADA anti-retaliation provision is that, by its terms, it provides only that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Thus, its text would seemingly confine ADA retaliation claims to those involving employees who oppose

unlawful employer practices or who participate in proceedings against such employers. That is why many ADA retaliation claims involve allegations that an employee was discriminated against because he complained about being treated differently because of his disability or immediately following filing a complaint with the employer or the EEOC. Such cases are textbook examples of retaliation given that the purpose of such anti-retaliation provisions was to "prevent employer interference with . . . remedial mechanisms . . . by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." 3C Fed. Jury Prac. & Instr. § 172:24 (6th ed.) (internal citations and quotation marks omitted). And, for a time, courts *were* limiting ADA retaliation claims to such facts. *See, e.g.*, *Schubert v. J C Penny Co.*, 176 F.3d 478 (5th Cir. 1999) ("There is no evidence that Simmons was terminated for opposing an ADA violation or participating in an ADA-related investigation or proceeding. Therefore, Simmons failed to create an issue of material fact as to her ADA retaliation claim."); *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1263-64 (10th Cir. 1998) ("To establish a prima facie case of retaliation . . . the plaintiff must show that (1) she engaged in protected opposition to discrimination or participated in a Title VII proceeding; (2) she suffered an adverse employment action contemporaneous with or subsequent to such opposition or participation, and (3) there is a causal connection between the protected activity and the adverse employment action.").

However, that trend did not hold, as can be seen from the current requirements for establishing a *prima facie* case of ADA retaliation. To do so, a plaintiff must show that "(1) she engaged in a statutorily protected activity, (2) the employer took an adverse action against her, and (3) there was a causal connection between the adverse action and the

protected activity." *Hill v. Walker*, 737 F.3d 1209, 1218 (8th Cir. 2013). While this standard naturally continues to include protected conduct like filing a complaint or participating in a hearing before the EEOC, it has also been interpreted to cover when an employee requests a reasonable accommodation and is subsequently discriminated against because of that request. *Clark v. Jewish Childcare Ass'n Inc.*, 96 F. Supp. 3d 237, 262 (S.D.N.Y. 2015) ("Plaintiff's claim that JCCA retaliated against her for taking disability leave satisfies the first element because requesting a reasonable accommodation of a disability is an ADA protected activity.") (citation, internal alterations, and quotation marks omitted); *Kirkeberg v. Canadian Pacific Ry.*, 619 F.3d 898, 908 (8th Cir. 2010) (noting, in a slightly different context, the questionable applicability of certain ADA retaliation claims given the text of § 12203(a) but concluding that making such a request is protected activity). Such claims, of course, can often closely resemble those advanced as ADA discrimination claims. In short, then, the recognition that requesting an accommodation qualifies as "protected activity" for purposes of an ADA retaliation claim has broadened the nature of the claims that can be asserted as retaliation claims and increased the likelihood that an ADA discrimination and ADA retaliation claim will look nearly identical in some contexts.

The Court finds that this is one of those cases. The bases of Larsen's ADA discrimination and retaliation claims are nearly identical. For both claims, Larsen argues that she was terminated following taking protected leave to have her disability (degenerative shoulder issue) diagnosed and treated. Moreover, because the Court found that Gilman's statements during his deposition qualified as direct evidence of discriminatory intent for Larsen's ADA discrimination claim, it also finds that this statement

qualifies as sufficient direct evidence of retaliatory intent. *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 550 (10th Cir. 1999), *cert. denied*, 528 U.S. 813 (1999) ("To prevail via this direct method, a plaintiff must introduce direct or circumstantial evidence that the alleged retaliatory motive actually relates to the question of discrimination in the particular employment decision."). This evidence certainly does that, and it is further supported by the fact that the record reveals the reason why Gilman might have wanted to retaliate against Larsen for taking such leave—he was disciplined by Maynard for slow production in the welding department. This Court's job at summary judgment is not to decide whether Larsen was truly terminated for taking this leave or whether Maynard really did terminate her for her instances of inappropriate conduct. All this Court has determined is that Larsen has presented enough evidence at summary judgment for this claim to proceed to trial. Maynard's motion for summary judgment as to Larsen's ADA retaliation claim is **DENIED**.

A similar result applies for Larsen's FMLA discrimination claim. Such a claim arises when "an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA." *Pulczinski*, 691 F.3d at 1006. For the same reasons that the Court has already concluded that Gilman's testimony constitutes direct evidence for ADA discrimination and retaliation, it concludes that such evidence also constitutes direct evidence for Larsen's FMLA discrimination claim, thus obviating the need to proceed further with the *McDonnell Douglas* analysis. Therefore, Maynard's motion for summary judgment as to Larsen's FMLA discrimination claim is **DENIED**.

However, the same is *not* true for Larsen's FMLA retaliation claim. The Eighth Circuit has recognized three separate causes of action under the FMLA, specifying the

role that each one plays and the rights that each claim exists to protect. Unlike what has happened with ADA retaliation claims, there does not seem to be a similar kind of "definition creep" in the context of FMLA retaliation claims. Indeed, as the Eighth Circuit noted in *Pulczinski*:

> If an employee opposes any practice made unlawful under the FMLA—for example, if an employee complains about an employer's refusal to comply with the statutory mandate to permit FMLA leave—then the employer may not for that reason take adverse action against the employee who is engaged in the opposition. As under Title VII, this claim is naturally described as a "retaliation" claim.

691 F.3d at 1006. There is no evidence in the record to support an FMLA retaliation claim. Simply put, there is no evidence that Larsen ever complained or "opposed" an action by Maynard that she contended violated the FMLA. For instance, unlike the complaint she was about to lodge about Maynard's differential treatment of men and women (see below), she never approached anyone at Maynard to complain about how Maynard handled her leave. Because she cannot make out a *prima facie* case of the specific type of conduct that constitutes an FMLA retaliation claim,[6] the Court will **GRANT** Maynard's motion for summary judgment as to this claim. Larsen's claim for FMLA retaliation will be **DISMISSED WITH PREJUDICE**.

---

[6] Larsen contends that Gilman's statements also constitute direct evidence of FMLA retaliation because these comments admit that "he was motivated to terminate Ms. Larsen because she took protected leave." (Doc. 33, p. 19). However, such a claim is more properly considered an FMLA discrimination claim, not a FMLA retaliation claim. *See, e.g.*, *Pulczinski*, 691 F.3d at 1006 (describing how an "employee making a FMLA discrimination claim must prove that the employer was motivated by the employee's exercise of rights under the FMLA").

### 3. Title VII Gender Discrimination and Retaliation Claims

Gender discrimination and retaliation claims are also both governed by the *McDonnell Douglas* burden-shifting framework. The Court first evaluates the record to see whether there is direct evidence of gender discrimination. Larsen argues that there is such evidence. In short, she contends that Gilman's testimony that he used the word "bitch" occasionally at work qualifies. She also argues more specifically that Gilman used this word in reference to her on two occasions. The first occurred shortly after Gilman was promoted to supervisor when he came out on the shop floor and reportedly said, "there's a new sheriff in town, bitch." Second, there is some testimony that there was an incident where Larsen approached a table where Gilman was standing, apparently scaring him. In response, Gilman blurted out: "bitch, fucking bitch." From these two events, Larsen contends that the Court can find direct evidence that her subsequent termination months later (years later in the case of the comments made following his promotion to supervisor[7]) was due to Gilman's discriminatory attitude against women.

The Court is unpersuaded. In short, it agrees with the numerous courts that have concluded that the use of the word "bitch" is insufficient to show gender bias. *Panelli v. First Am. Title Ins. Co.*, 704 F. Supp. 2d 1016, 1030 (D. Nev. 2010) ("Although the term 'bitch' has a gender-specific connotation, this connotation is not so strong as to establish that Stone, by uttering the word, discriminated against Molnar 'because of' her gender."); *Kriss v. Spring Commc'ns Co. P'ship.*, 58 F.3d 1276, 1281 (8th Cir. 1995) (the word "bitch"

---

[7] The evidence is that Gilman was Larsen's supervisor from March 2014 until the date of her termination almost two and a half years later.

fails to indicate a "general misogynist attitude" and is not "particularly probative of gender discrimination").[8]

Thus, although clearly inappropriate and while the additional context in which the comments were made makes this a close case, the Court finds that these comments cannot qualify as direct evidence that Larsen's later termination was because of her gender. Thus, the Court must analyze these claims under the *McDonnell Douglas* framework.

The Court finds that Larsen has sufficiently made out a *prima facie* case of gender discrimination. In order to make out a *prima facie* case, Larsen must show that she "(1) is a member of a protected class, (2) was qualified, (3) suffered an adverse employment action, and (4) can provide facts that give rise to an inference of unlawful . . . discrimination." *Robinson v. Am. Red Cross*, 753 F.3d 749, 754 (8th Cir. 2014). As a woman who worked in the welding department at Maynard for years before she was terminated, Larsen clearly demonstrates her membership in a protected class, that she was qualified for the job, and that she suffered an adverse employment action. Thus, she must only demonstrate that she can show facts that give rise to an inference of discrimination to complete her *prima facie* case. The Court finds that she has done so by pointing to evidence in the record that similarly situated male employees who were disciplined by Maynard were given extra chances to "course-correct" before being terminated and that Larsen may have deviated in her case from its usual practice of

---

[8] The closest "direct" evidence the Court has found of gender discrimination is Mr. Maynard's statement to Larsen at one point early in her tenure there that women shouldn't be welders. Nevertheless, Mr. Maynard played no part in the decision to terminate Larsen, and Larsen's briefing does not argue that this comment from her early tenure at Maynard qualifies as direct evidence of gender discrimination.

allowing individuals to explain themselves before a termination decision was made. This is sufficient to meet the burden of establishing a *prima facie* case, which is not onerous. *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 944-45 (8th Cir. 1994).

Larsen has also made out a *prima facie* case of Title VII retaliation on the basis of gender. Such a claim prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of Title VII retaliation, a plaintiff must initially establish that 1) she engaged in protected conduct, 2) she suffered a materially adverse employment action, and 3) there is a causal relationship between the activity and the adverse action. *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1021 (8th Cir. 2011).

Larsen has established that she had asked a co-worker, Randall Lewis, to come with her to report that she, as the lone female welder, was the victim of workplace gender discrimination and that she was being treated differently in terms of assignments because she was a female. While Lewis refused to accompany her, he did ultimately relay his conversation with Larsen to Susan Lisenbee, who was the one who informed Larsen of her termination. Such evidence, coming so closely on the heels of her subsequent termination, is sufficient to meet Larsen's initial burden.

Next, the Court finds that Maynard has advanced a legitimate, non-discriminatory reason for Larsen's termination. In short, Lisenbee was investigating several claims involving Larsen around the same time. First, on August 4 or 5, Larsen's supervisor, Gilman, reported Larsen's comment that it was "bullshit" that she was being sent to deburr

to Lisenbee. In addition, Lisenbee had already been approached by Lewis to discuss Larsen's allegedly inappropriate comments toward him following his wife's death. In addition, Larsen had been previously disciplined for rude comments and behavior in front of coworkers. Collectively, this evidence is sufficient to satisfy Maynard's burden of advancing a legitimate reason for terminating Larsen.

Thus, whether summary judgment is proper on Larsen's gender discrimination and retaliation claims boils down to whether Larsen has sufficiently elicited evidence to show that Maynard's asserted legitimate reason was simply pretext for unlawful discrimination. Although there is some strong evidence favoring the opposite conclusion, the Court concludes that Larsen has demonstrated sufficient evidence of pretext in order to defeat Maynard's motion for summary judgment on these claims. In short, Larsen has adduced evidence that other male comparators were given multiple chances to correct their behavior before being terminated and that Maynard and Lisenbee did not follow the usual practice of letting an employee tell her side of the story before making the termination decision (since the decision to terminate Larsen was made while she was in Minnesota).[9] While the jury may ultimately disagree with Larsen's arguments, she has done enough to advance to trial on these two claims. Therefore, Maynard's motion for summary judgment as to Larsen's Title VII discrimination and retaliation claims will be **DENIED**.

---

[9] Larsen also argues that Maynard's rationale for her termination has shifted. While the Court recognizes some support for that in the record (including the addition of "insubordination" to the Lisenbee affidavit at a later time), the Court ultimately does not find that this argument sufficiently supports Larsen's pretext argument, especially given that Larsen's termination notice reflected that she was being terminated for disrespect to managers, a statement that clearly encompasses the idea of insubordination.

## B. Non-*McDonnell Douglas* Claims

## 1. ADA Reasonable Accommodation

A plaintiff alleging a failure-to-accommodate violation of the ADA need not engage with the traditional *McDonnell Douglas* framework. "This is so because a claim against an employer for failing to reasonably accommodate a disabled employee does not turn on the employer's intent or actual motive. The *McDonnell Douglas* line of cases, however, is aimed at fleshing out this elusive factual question of intentional discrimination." *Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004) (quotation omitted). Instead, the Eighth Circuit has prescribed "a modified burden-shifting analysis," *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003) (quotation omitted), in which the plaintiff "must establish both a prima facie case of discrimination based on disability and a failure to accommodate it," *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 905 (8th Cir. 2015). The plaintiff then has the burden to show "that the requested accommodation is 'reasonable on its face, *i.e.*, ordinarily or in the run of cases.'" *Peebles*, 354 F.3d at 768 (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)). The Eighth Circuit has also recognized that the ADA creates a "shared responsibility between employers and employees to resolve accommodation requests." *E.E.O.C. v. Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d 790, 795 (8th Cir. 2007). This shared responsibility is more frequently referred to as the "interactive process." *Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 902 (8th Cir. 2009). A disabled employee must:

> Demonstrate the following factors to show that an employer failed to participate in the interactive process: 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the

employer's lack of good faith.

*Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 952 (8th Cir. 1999).

The Court finds that Larsen cannot establish a *prima facie* case that Maynard failed to accommodate her. Larsen's primary argument on this front is that Maynard "ceased" accommodating her when it terminated her following her two different periods of leave. This is insufficient.

Under extant Eighth Circuit law, "the predicate requirement triggering the interactive process is the employee's request for the accommodation." *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1045 (8th Cir. 2005) (citing *Ballard v. Rubin*, 284 F.3d 957, 960 (8th Cir. 2002)). This is because "[a] mere assertion that an accommodation is needed is insufficient; the employee must inform the employer of the accommodation needed." *Id.*

The only evidence in the record of Larsen's requests for accommodation for her alleged disability are when she requested a nine-week medical absence and when she requested time off to go to the Mayo Clinic to have her shoulder evaluated. In both cases, Maynard approved the time off and permitted Larsen to do exactly what she wished. In addition, although she testified that she did not specifically request a table to accommodate her and help her avoid lifting heavy objects, it is undisputed that she was ultimately provided with a table. In short, there is no evidence of any request for accommodation that went unfulfilled by Maynard. It is not enough to say that a termination prevents some future, nebulous, unspecified request that an employee *might* have made, for then every terminated employee with a disability would allege that employers "ceased" accommodating them when disciplinary action was taken against them, despite them having never requested such accommodation. Such a claim will not lie. Ultimately, Larsen

has advanced no evidence that some accommodation that she requested went unfulfilled by Maynard, and the failure to do so is fatal to this claim. As a result, the Court **GRANTS** Maynard's motion for summary judgment as to the failure-to-accommodate claim. That claim will be **DISMISSED WITH PREJUDICE**.

## 2. FMLA Interference (Entitlement)

In order to establish a claim for FMLA interference, Larsen must show that her employer has interfered with, restrained, or denied the exercise or the attempt to exercise any right protected by the statute. *Rogers v. City of Des Moines*, 434 F.3d 904, 909 (8th Cir. 2006); 29 U.S.C. § 2615(a)(1). However, it is black letter law that the FMLA provides no relief to a plaintiff unless she has been prejudiced by the violation. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002); *see also Rogers*, 435 F.3d at 909. That is due, in part, to the fact that the cause of action for FMLA interference is narrow. *See, e.g.*, *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 739-40 (2003) ("[T]he cause of action under the FMLA is a restricted one: The damages recoverable are strictly defined and measured by actual monetary losses.").

The Court finds that summary judgment is also proper on this claim. Larsen's FMLA interference claim appears to be entirely predicated on her argument that Maynard never gave Larsen FMLA leave paperwork during the nine-week medical absence when she was on worker's compensation. However, the Court finds that even if such a failure occurred and even if such a failure constitutes a violation of the FMLA, Larsen has not demonstrated that she was prejudiced in any way by the violation. Such proof is a requirement of a FMLA interference claim. For example, it is unclear how Larsen could possibly have been

prejudiced by this violation when she was able to be on worker's compensation for nine weeks.

The Court in many ways finds this case analogous to *Hudson v. Tyson Fresh Meats, Inc*. There, an employee indicated that he needed to request leave for a certain period for illness that prevented him from being able to work. 787 F.3d 861, 863-64 (8th Cir. 2015). In order to complete his paperwork, he signed a "Leave of Absence Application," which gave him the option of selecting FMLA or Medical (Non FMLA) leave. *Id.* at 864. Although he claimed never to have checked a box next to Medical (Non FMLA) leave and that someone else must have checked it for him, the Eighth Circuit held that his allegations that Tyson interfered with his FMLA leave because his leave was misclassified as Non FMLA leave when he intended to take FMLA leave were insufficient to sustain an FMLA entitlement claim. *Id.* at 865. In making this determination, the Eighth Circuit noted that there was no dispute that he was able to take leave from his job and he had failed to allege how he was prejudiced by this absence because he was not denied compensation or benefits. *Id.*

The same holds true here. Larsen has failed to show any prejudice resulting from the alleged failure of Lisenbee to provide FMLA paperwork to Larsen before she took the nine-week medical absence on worker's compensation. There is no allegation (much less proof) that such worker's compensation program would somehow be less desirable than FMLA leave.[10] Without such proof of prejudice, this claim fails. Therefore, Maynard's

---

[10] Although Larsen's brief analyzes this claim only with respect to the nine-week period when Larsen was out on worker's compensation, her Complaint originally alleged a similar violation for her second period of leave (the three days to travel to the Mayo Clinic). To the extent that Larsen's FMLA entitlement claim is premised on this second period, the Court also finds that summary judgment is appropriate. There is no evidence in the

motion for summary judgment is **GRANTED** with respect to Larsen's FMLA interference (entitlement) claim. That claim is **DISMISSED WITH PREJUDICE**.

## C. Arkansas Civil Rights Act

Finally, Larsen's Complaint asserts a cause of action under the ACRA for gender discrimination. Fortunately for analytical clarity, claims premised on violations of the ACRA are analyzed in the same manner as their federal counterparts. *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 615 n.3 (8th Cir. 2000) ("Claims premised under the Arkansas Civil Rights Act of 1993 are analyzed in the same manner as Title VII claims."). Thus, the Court preserves Larsen's ACRA gender discrimination claim for the same reason it preserved her federal Title VII claims of gender discrimination and retaliation.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Maynard's Motion for Summary Judgment (Doc. 31) is **GRANTED IN PART AND DENIED IN PART**. The motion is **GRANTED** with respect to Larsen's ADA Failure to Accommodate, FMLA Retaliation, and FMLA Interference (Entitlement) claims. These claims against Maynard are **DISMISSED WITH PREJUDICE**. The motion is **DENIED** in all other respects.

**IT IS SO ORDERED** on this 2nd day of July, 2019.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

---

record that Maynard impeded Larsen's ability to take FMLA leave for this period. In fact, the evidence shows that Maynard suggested that she take such leave and provided her with the application paperwork at least twice (including once when she ended up not getting seen at the Mayo Clinic in June). Because there is no evidence of prejudice, any purported entitlement claim based on these facts would also fail.